# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

_____

UNITED STATES OF AMERICA :

     Plaintiff,          :       CRIM. NO.  11-719 (SDW)

     v.               :

DERISH WOLFF,          :

     Defendant.     :

_____

---

## MOTION FOR BILL OF PARTICULARS

---

      Comes now Defendant Derish M. Wolff, by and through undersigned counsel, and pursuant to Rule 7(f), respectfully requests the Court to order the government to file a bill of particulars.

## I. Preliminary Statement

      On October 19, 2011, Mr. Wolff was indicted in a fourteen-page indictment on one count of conspiracy to file false claims and five counts of filing false claims. ("the Indictment")  (Doc. 1).  The Indictment alleges that Mr. Wolff, while employed as the CEO and President of the Louis Berger Group, Inc. ("LBG"), and

1

subsequently as the Chairman of the Board of LBG's parent company, Berger Group Holdings, Inc. ("BGH"), was part of a *twenty-year* conspiracy to overcharge the government by fraudulently calculating overhead rates and, thereby, inflating overhead costs appropriately attributable to two identified contracts *and an unspecified number of unidentified government contracts* for work performed by LBG all over the world over the *twenty-year* span of the alleged conspiracy. The Indictment alleges that Mr. Wolff conspired with others, both named and not named, and that he aided "others" to obtain payment of the false claims.

The allegations of conspiracy during the first ten years, between 1990 and 2000, are lacking in critical details necessary to preparing a defense. The allegations relating to this earlier ten-year period appear to be based upon the contention that "P.P.", who served as LBG's Controller from 1972 until about 2000, instructed *unidentified other employees* to "pad" an *unspecified number of their government overhead work hours* on *unidentified government projects*. As it concerns these allegations, Mr. Wolff is identified, "among *others*", as the person to whom P.P., who "submitted LBG's contract billing proposals to the federal government, and was responsible along with *others* for the integrity of the cost data," allegedly "reported". It is further alleged that on *unspecified "multiple occasions" from 1990 until 2000,* P.P. and Mr. Wolff ordered LBG's Assistant Controller, who is not otherwise identified, to pad the government overhead cost

code with work hours the Assistant Controller had not devoted to government projects (again, not specified), and further ordered the Assistant Controller to ensure that subordinates (not further identified) also padded their overhead work hours on the unspecified government projects.

The conspiracy alleged over the following ten years apparently involved different persons and a different scheme, as well as the wholly different time period of about 2000 to 2009. The false claims pursuant to this later scheme allegedly relate to the submission by LBG and, in particular, the former head of the accounting department from 2000 through 2009, Salvatore Pepe ("Pepe"), and his principal assistant, Precy Pellettieri ("Pellettieri"), of inflated overhead billing rates achieved by preparing false and fraudulent journal entries reclassifying employee work hours and other indirect costs. The employees and other indirect costs are not identified.

The Government's use of terms such as "padding" and "inflating" hours and costs makes it appear as though this is a simple and straightforward fraud. It is not. What may be difficult for the Court to fully appreciate at this early juncture, is that there are inherent ambiguities associated with identifying and billing overhead costs and, more particularly, identifying those costs associated with a particular client. By definition, overhead costs and indirect costs are not directly attributable to any particular client or project. They are costs expended more generally in

support of the overall business, to include utility costs, rents associated with common areas, and the wages of employees that perform functions necessary to the business as a whole, which indirectly benefit many clients and projects. Nevertheless, a fair portion of such costs were billable to the government. The Indictment itself acknowledges that indirect and overhead costs were permitted to be billed to the government even though they supported the business as a whole and were not directly attributable to government work.[1] The difficulty lie in determining how to apportion these costs fairly and accurately. The process of identifying, collecting, and billing overhead and direct costs was complicated, confusing, and subject to modification. In fact, all five of the Indictment's substantive counts and allegations central to the conspiracy speak of an *estimated* overhead rate that was expressly *provisional,* to be used on an *interim* basis.[2] Yet, the Government's entire case is built upon the premise that LBG and persons

---

[1] Count One of the Indictment at ¶ 3.b.(iii) explains that:

> LBG's cost-reimbursable contracts with USAID also permitted LBG to bill USAID for indirect costs. Indirect costs were overhead expenses, such as rent and depreciation, and general and administrative ("G&A") expenses, such as accounting and legal costs, which were as a general matter incurred in support of LBG's overall business rather than in support of a particular contract.

[2] Count One, ¶ 3.d.(iii) and (iv) explain that "LBG would estimate a 'provisional rate'", which was used to negotiate a "proposed 'Negotiated Indirect Cost Rate Agreement' ('NICRA')," which was to be used as "an interim GG rate." Paragraphs 12e, 12h, and 12i of Count One and Counts Two through Six allege that the NICRA rate was fraudulent and false.

working for LBG, including Mr. Wolff, set about with criminal intent to add, modify, or redistribute the overhead and indirect costs pursuant to the process of calculating the estimated indirect cost rate – concepts that are equally consistent with innocence as guilt.  This case cannot be properly defended without knowing the details of what the Government alleges was fraudulently done to calculate the overhead rates and when, and what the rates would have been without the alleged fraud because such details are critical to drawing the distinction between fraudulent manipulation and best efforts to get it right.  This problem is exacerbated by the fact that Mr. Wolff's alleged criminal responsibility is largely based upon the conduct of others.

The Indictment, particularly as it concerns the 2000-2009 conspiracy, makes sweeping allegations against Mr. Wolff based strictly on his position as an executive of the company.  For example, it appears that Mr. Wolff's criminal responsibility in the 2000 to 2009 scheme is based largely upon the allegation that he "advanced a policy" to fraudulently inflate the government overhead rate.  *See e.g.*, Indictment, ¶¶ 10, 11, 12f-12i.[3]  However, the Indictment does not provide any information about when, how, or by whom such policy was implemented, what Mr. Wolff did to advance it, or when within the ten-year period he did so.

---

[3] Unless otherwise indicated, all references to paragraphs in the Indictment are to paragraphs in Count One.

It is not even clear whether the Government alleges that Mr. Wolff advanced one or more than one policy that led to criminal conduct by others.  Paragraph 10 of the Indictment appears to identify a policy to fraudulently charge to the government common overhead costs specifically associated with LBG's Washington D.C. office.  Paragraph 11 refers to a policy to make fraudulent submissions to the government, which inflated the overhead cost calculations. Neither of these two paragraphs provides any information about when or how the policy was implemented, and Mr. Wolff is left to guess about what he is alleged to have done, how many times he did it, and when he did it.

The Indictment also alleges that Pellettieri "reported" to Pepe (¶ 1f), and acted "under the direction and supervision" of Pepe and Mr. Wolff when, "on a periodic basis", she completed journal entries to improperly reclassify employee work hours and indirect costs (¶¶ 8 and 9).  The Indictment fails to set forth any particulars about when, how, or on how many occasions Mr. Wolff "directed" Pellettieri to commit fraudulent acts.   Nor does it set forth critical particulars about Pellettieri's alleged illegal acts to improperly reclassify these overhead costs, such as when or how many times she engaged in such conduct, which rates were altered as a result of such conduct, and when and on what contracts or projects such rates were used to bill the government.  As the Indictment itself alleges, there were many different rates calculated over the years, and not all of the rates calculated

were used to bill all government contracts, or were even used to bill the government at all.

As set forth below, the Government is obligated, at a minimum, to identify all persons with whom Mr. Wolff is alleged to have conspired to commit fraud, and, in this particular case, must also be required to provide more particularity about when, how, and on what government contracts and projects Mr. Wolff engaged in criminal activity, if Mr. Wolff is to be afforded a meaningful opportunity to prepare his defense.

## II. Applicable Law and Argument

Rule 7(f) provides that "the Court may direct the government to file a bill of particulars" upon a motion by the defendant.  The Third Circuit has explained that "motions for a bill of particulars should be granted whenever an indictment's failure to provide factual or legal information significantly impairs the defendant's ability to prepare his defense or is likely to lead to prejudicial surprise at trial." *U.S. v. Rosa*, 891 F.2d 1063, 1066 (3d Cir. 1989).  Furthermore, the Third Circuit has described the purpose of a bill of particulars as follows: "to inform the defendant of the nature of the charges brought against him to adequately prepare his defense, to avoid prejudicial surprise during the trial and to protect him against a second prosecution for an inadequately described offense."  *United States v. Addonizio*, 451 F.2d 49, 63–64 (3d Cir.1971) (internal quotations omitted).  A bill

of particulars should include, "[t]o the extent that the government is able to do so, the precise date and place of each event alleged in the indictment." *U.S. v. Gatto*, 746 F.Supp. 432, 477 (D.N.J. 1990), overruled on other grounds, *U.S. v. Gatto*, 924 F.2d 491 (3d Cir. 1991). A bill of particulars is also designed to limit and define the government's case. *See United States v. Smith*, 776 F.2d 1104, 1111 (3d Cir.1985).

"In deciding whether to grant the bill [of particulars], the Court may consider the scope of information available through discovery as well as the information set forth in the indictment." *U.S. v. Brown*, 2008 WL 5484121, *6 (D.N.J. 2008). "However, disclosure by the government of 'mountains of documents' is not an adequate substitute for a bill of particulars when the disclosure does not provide guidance regarding what the government would prove at trial." *U.S. v. Kemp*, 2004 WL 2757867, *8 (E.D.Pa. 2004). The Court may also consider other factors, including the complexity of the offense charged and the clarity of the indictment. *See, e.g., United States v. Rogers*, 617 F.Supp. 1024, 1026 (D.Colo. 1985); *see also, United States v. Bin Laden*, 92 F.Supp.2d 225, 234 (S.D.N.Y. 2000) ("sometimes the large volume of material disclosed is precisely what necessitates a bill of particulars") citing *United States v. Bortnovsky*, 820 F.2d 572, 575 (2nd Cir. 1987) ("providing mountains of documents to defense counsel" when indictment contained general allegations of fraud "impermissibly shifted" the

burden of proof to the defendants, necessitating a bill of particulars.) Although the decision of whether to grant a bill of particulars is generally a matter within the sound discretion of the trial court, if the particular requested is such that on its face its nondisclosure until trial would result in prejudicial surprise to the defendant or the preclusion of an opportunity for meaningful defense preparation, then the request must be granted. *See Rosa*, 891 F.2d at 1067 (holding a defendant can successfully attack the denial of a bill of particulars if "he demonstrates both that the trial court abused its discretion in denying relief and that surprise or other prejudice resulted from his having been deprived of the requested information at the pre-trial stage."); *see also Rogers*, 617 F.Supp. at 1027, citing *United States v. Thevis*, 474 F.Supp. 117 (N.D.Ga. 1979).

In cases involving allegations of conspiracy, "the names of all co-conspirators or participants in the alleged offenses should be provided, except insofar as the Government can show, in camera, that such disclosures might endanger the safety of prospective witnesses." *U.S. v. Vastola*, 670 F.Supp. 1244, 1269-70 (D.N.J. 1987) (internal quotation omitted); *see also U.S. v. Mariani*, 90 F.Supp.2d 574, 592 (M.D.Pa. 2000) (holding that the Government must produce a Bill of Particulars identifying "co-conspirators and other participants" in the alleged seven year conspiracy); *U.S. v. Keystone Automotive Plating Corp.*, 1984 WL 2946, *2 (D.N.J. 1984) (in response to defendant's filing of a Motion for a Bill

of Particulars, the Government voluntarily filed a Bill of Particulars naming the co-conspirators referred to in the indictment.); *U.S. v. Rogers*, 617 F.Supp. 1024, 1028 (D.C.Colo. 1985) ("It is well-settled that the government must identify undisclosed and unidentified co-conspirators, aiders and abettors, and other individuals involved in the criminal acts charged; especially where the government plans to call such persons as witnesses.")

The Government has recognized that this is a complex case, which it investigated for nearly five and one-half years before bringing the Indictment. During the course of that investigation, the Government executed a search of LBG and seized as much as two million pages of electronic and hard copy material. Discovery in the matter is ongoing, but even if the Government follows through with its promise to produce or make available all of the materials seized from LBG and the additional materials provided by LBG to the Government during the investigation, such materials will not provide the necessary clarity that is otherwise lacking in the Indictment, which bases criminal responsibility on vague and elastic terms and concepts such as:

- Acting with unidentified "others";

- "Advancing a policy";

- "Supervising" others or being the person to whom others involved in alleged criminal conduct "reported";

10

- "Directing" or "ordering" others to take generic action without any specificity as to time and place other than that it occurred over a ten or twenty year period;

- Agreeing that false claims be submitted on government contracts, which could number from two to hundreds; and

- Reclassifying overhead and indirect costs in order to calculate interim indirect cost rates.

The allegations brought against Mr. Wolff involve complex and ambiguous concepts, and the Indictment does not provide sufficient particulars and clarity to permit Mr. Wolff to understand and defend them.  The defense cannot adequately prepare a defense without knowing the identity of all of the co-conspirators and participants in the alleged offenses, and the specific persons with whom Mr. Wolff allegedly conspired, and the Government should be directed to provide this information.

Furthermore, the alleged criminal events cover more than a twenty-year period and, in many cases, involve unremarkable business events and activities. Therefore, in order for Mr. Wolff to adequately prepare his defense and to avoid prejudicial surprises during the trial, the Government should also be directed to more specifically define its case by identifying the specific contracts to which the allegations relate, identifying the specific illegal acts committed by *others* and

when during the twenty years covered by the Indictment such acts were committed, and identifying the specific illegal acts that Mr. Wolff is alleged to have committed, and disclosing when he is alleged to have committed them.

Finally, the Government should be required and directed to disclose particulars about the alleged fraudulent indirect cost rates, to include the specific costs that were allegedly padded and inflated, how the overhead rates calculated were fraudulent, and what rates the Government contends would have resulted without fraud.

## III. Requested Particulars

Accordingly, Mr. Wolff requests the following particulars:

1. Paragraphs 1d, 1e, and 1f of the Indictment identify the Co-conspirators as "P.P.", Sal Pepe and Precy Pellettieri.  However, the Indictment elsewhere alleges that Mr. Wolff conspired with "*others*" in addition to or instead of one or all three of the above-referenced co-conspirators  (*see e.g.,* Paragraphs 4, 6, 10, and 11).  The government should be directed to disclose:

    a. the identity of "P.P.";

    b. whether or not there were persons other than P.P., Pepe, and Pellettieri who are alleged to be co-conspirators;

12

   c.  if so, the Government should disclose the identity of each of the

       "*others*", who allegedly conspired to:

        i.  "defraud the United States and . . .USAID, by obtaining. . .the

           payment and allowance of false, fictitious, and fraudulent

           material claims. . ." as alleged in Paragraph 4;

        ii.  "enrich BGH, LBG, and themselves by billing USAID for

           LBG's indirect costs at falsely inflated rates" as alleged in

           Paragraph 5;

       iii.  "target a GG rate of at least approximately 140 percent" as

           alleged in Paragraph 6;

       iv.  knowingly advance the policy to "charge the GG997B account

           for all rent for common areas , , , notwithstanding that the

           Washington, DC office supported LBG projects unrelated to

           USAID" as alleged in Paragraph 10;

       v.  "submit to DCAA and USAID periodic ICSs and NICRAs with

           GG rates artificially inflated by the schemes described [in the

           Indictment]" "as a matter of LBG policy" as alleged in

           Paragraph 11;

   d.  the identity of "LBG's Assistant Controller", whom

    i.  Derish Wolff and P.P. allegedly "ordered . . . to pad the GG997A cost code" as alleged in Paragraph 12a;

    ii.  Derish Wolff and P.P. allegedly "ordered . . . to ensure that his or her subordinates padded the GG997A cost code" as alleged in Paragraph 12b;

    iii.  Derish Wolff allegedly instructed in 2001 to increase the costs appropriately attributable to the GG997B cost code, for purposes of the ICSs, as set forth in Paragraph 12c;

e.  whether or not the Assistant Controller referenced in each of Paragraphs 12a, 12b, and 12c is alleged to be a co-conspirator;

f.  the identity of any and all other co-conspirators and participants in the alleged offenses.

2.  Paragraphs 1d and 1e allege that Co-conspirators P.P. and Pepe submitted the contract billing proposals (also referred to as "ICSs") and that each "was responsible along with *others* for the integrity of the cost data reported in those submissions," which the Indictment later alleges to have been fraudulent (see e.g., Paragraphs 11, 12c and 12f). These two paragraphs also allege that Co-conspirators P.P. and Pepe, "reported to defendant Derish Wolff among *others*". The government should be directed to identify:

a. the *others* who were responsible for the integrity of the data reported in the ICSs or other fraudulent contract billing proposals submitted to the government;

b. the "*others*" to whom P.P. and Pepe reported; and

c. which of the "*contract billing proposals*" or *ICS*s were false or fraudulent.

3. Paragraph 3a(i) and (ii) presumably identify two contracts that are implicated by the alleged fraudulent billing, however Paragraph 3a(iii) alleges that "from in or about 2002 through in or about 2006, USAID awarded LBG *additional contracts* for reconstructive work in Afghanistan, Iraq, and other developing Nations".  The government should be directed to disclose:

a. whether such *additional contracts* are implicated by the alleged fraudulent billing; and if so,

b. which such *additional contracts* are implicated by the alleged fraudulent billing alleged in the Indictment.[4]

---

[4] In a letter dated 1/5/2012, Mr. Wolff requested the Government provide copies of the contracts referred to by Paragraphs 3a and 3b of the Indictment, including the "additional contracts" referenced in 3a(iii).  By letter dated 1/11/2012, the Government represented that the defense would need to "specify which contracts [the defense] would like to inspect."  It is impossible for

4. Similarly, Paragraph 10 of the Indictment alleges that LBG, "as a matter of policy that was knowingly advanced by [Mr. Wolff], P.P., Salvatore Pepe, and others", would fraudulently charge the GG997B for indirect costs unrelated to "USAID and *other* federal government contracts."  The government should be directed to identify:

   a. the specific USAID contracts that are implicated by the alleged policy to fraudulently charge unrelated indirect costs; and

   b. the *other* federal government contracts that are implicated by the alleged policy to fraudulently charge unrelated indirect costs.

5. Paragraph 7 of the Indictment alleges that Mr. Wolff *and* P.P. "would instruct *their subordinates* to ensure that *certain LBG employees* at East Orange headquarters, such as accounting employees, charged *a certain number of work hours* to the GG997A cost code irrespective of whether those employees had actually devoted those work hours to GG projects, thereby raising the GG rate."  The government should be directed to identify:

the defense to know which contracts to request unless and until the Government specifies the additional contracts, if any, that are implicated by the alleged fraudulent billing scheme.

    a.  the *subordinates* whom Mr. Wolff instructed, and the *subordinates* whom P.P. instructed;

    b.  the *certain LBG employees* that were the subject of the instructions; and

    c.  the *number of work hours* that employees were instructed charge irrespective of whether the employee devoted such work hours to GG projects.

6.  Paragraphs 8 and 9 of the Indictment each allege that Precy Pellettieri, "*under the direction and supervision of* Salvatore Pepe and [Mr.] Wolff, would": "improperly reclassify the work hours *of LBG employees* at East Orange headquarters, unbeknownst to those LBG employees or despite their objections. . ." (Paragraph 8); and "improperly reclassify by journal entry *dozens of LBG corporate indirect costs* by transferring these costs. . ." (Paragraph 9).  The government should be directed to disclose:

    a.  whether or not Mr. Wolff expressly directed Pellettieri to improperly reclassify the work hours *of LBG employees*, and if so,

       i.  *which LBG employees*; and

      ii.  which LBG employees *objected* to the reclassification of their work hours;

17

b. whether or not Mr. Wolff expressly directed Pellettieri to improperly reclassify by journal entry *dozens of LBG corporate indirect costs;* and if so,

   i. which *LBG corporate indirect costs* Mr. Wolff directed be improperly reclassified; and

   ii. which LBG corporate indirect costs were, in fact, improperly transferred by journal entry.

7. Paragraph 4 alleges a conspiracy that existed from 1990 through July 2009. Paragraphs 6 through 11 then allege various acts that occurred within that twenty-year time period without any further specificity as to when such acts occurred. The government should be directed to provide:

a. the dates that "Derish Wolff, Salvatore Pepe, and others would target a GG rate of at least approximately 140 percent irrespective of the actual rate," as alleged in Paragraph 6;

b. the dates that "Derish Wolff and P.P. would instruct their subordinates" to fraudulently charge work hours to the GG997A cost code as alleged in Paragraph 7;

c.  the dates that "Precy Pellettieri, under the direction and supervision of Salvatore Pepe and Derish Wolff, would improperly reclassify the work hours of LBG employees…" as alleged in Paragraph 8;

d.  the dates that Mr. Wolff directed Precy Pellettieri to "improperly reclassify the work hours of LBG employees" as alleged in Paragraph 8;

e.  the dates that "Precy Pellettieri, under the direction and supervision of Salvatore Pepe and Derish Wolff, would improperly reclassify by journal entry dozens of LBG corporate indirect costs…" as alleged in Paragraph 9;

f.  the dates that Mr. Wolff directed Precy Pellettieri to "improperly reclassify… indirect costs" as alleged in Paragraph 9;

g.  the dates that "LBG, as a matter of policy that was knowingly advanced by Derish Wolff…and others," would fraudulently charge the GG997B account for inappropriate expenses as alleged in Paragraph 10; and

h.  the dates that P.P., Pepe, and others submitted to DCAA and USAID periodic ICSs and NICRAs with artificially inflated GG rates "as a matter of LBG policy that was knowingly advance by" Mr. Wolff as alleged in Paragraph 11.

8. Similarly, Paragraphs 12a and 12b allege acts that occurred on "multiple occasions" within at least an approximate eleven-year time period "from in or about 1990 until in or about 2000."  The Government should be directed to provide:

   a.  the dates that Mr. Wolff and P.P "ordered LBG's Assistant Controller to pad the GG997A cost code" as alleged in Paragraph 12a; and

   b.  the dates that Mr. Wolff and P.P "ordered LBG's Assistant Controller to ensure that his or her subordinates padded the GG997A cost code" as alleged in Paragraph 12b.

9. Paragraphs 10, 11, and 12f through 12i each allege acts in furtherance of a "policy" advanced by Mr. Wolff.  To the extent not already provided pursuant to the above requests for particulars, the Government should be directed to disclose:

   a.  when, how, and by whom each policy was implemented; and

   b.  how Mr. Wolff "advanced" each policy.

10. Paragraph 12c alleges that Mr. Wolff instructed LBG's Assistant Controller to charge all Washington, DC common area rent and "*other* common overhead expenses" to the government, notwithstanding that the Washington, DC office supported projects unrelated to USAID and other

federal government contracts.  The Government should be directed to identify:

    a.  the *other* common overhead expenses referenced;

    b.  the LBG non-government projects supported by the Washington, DC office at the time; and

    c.  the amount of Washington, DC common and indirect costs that were fraudulently charged to the government.

11.  Paragraphs 12e through 12i each set forth an overhead rate that is alleged to be fraudulent.  Similarly, Counts Two through Six alleged that the overhead rate was false.  The Government should be directed to disclose:

    a.  the fraudulent cost data upon which the 2002 143.51% overhead rate was based, as alleged in Paragraphs 12e;

    b.  how and what made the 2002 143.51 % overhead rate fraudulent and false, as alleged in Paragraphs 12h and 12i, and Counts 2 through 6;

    c.  what the Government contends the correct rate to have been for 2002;

    d.  what rate the Government contends should have been used from December 2005 through February 2006 on the Iraq VTES contracts (instead of the alleged fraudulent rate of 143.51 % as alleged in Paragraph 12h), and the cost data upon which the Government bases that contention;

e.   what rate the Government contends should have been used from December 2005 through July 2009 on the Afghanistan REFS contract (instead of the alleged fraudulent rate of 143.51 % as alleged in Paragraph 12i), and the cost data upon which the Government bases that contention;

f.   how and what made the 2004 146.49 % overhead rate fraudulent, as alleged in Paragraph 12f, and what the Government contends the correct rate to have been;

g.   how and what made the 2005 140.79 % overhead rate fraudulent, as alleged in Paragraph 12g, and what the Government contends the correct rate to have been;

h.   what rate the Government contends should have been used on the specific dates in 2006 and 2007, which are set forth in Counts Two through Six (instead of the alleged false rate of 143.51 %), and the cost data upon which the Government bases that contention

Respectfully submitted this 28th day of March, 2012.

s/Herbert J. Stern
Herbert J. Stern
Mark Rufolo
Jeffrey Speiser
Stern & Kilcullen

325 Columbia Turnpike
Florham Park, New Jersey 07932
(973) 535-1900
(973) 535-9664 (facsimile)

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of March, 2012, a true and correct copy of the

foregoing **MOTION FOR BILL OF PARTICULARS** was served on the

following via the U.S. District Court CM/ECF system:


_____s/Mark Rufolo_____
Mark Rufolo