UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**DERISH M. WOLFF** | Crim. No. 11-719 (FSH)<br><br>Motion Day: October 16, 2012 |

MEMORANDUM OF LAW OF DERISH M. WOLFF
IN SUPPORT OF HIS MOTION FOR DISCOVERY PURSUANT TO
THE CONSTITUTION, *BRADY* AND RULE 16

STERN & KILCULLEN, LLP
325 Columbia Turnpike
Florham Park, New Jersey 07932
Telephone: 973-535-1900
Facsimile: 973.535.9664

Attorneys for Defendant Derish M. Wolff

# TABLE OF CONTENTS

**Page**

Table of Authorities ........ ii

Preliminary Statement ........ 1

Statement of Relevant Facts ........ 6

A. Background ........ 6
B. Harold Salomon and the Qui Tam Matter ........ 7
C. Premature Conclusions or Misconceptions Led to Inappropriate Government Action against Mr. Wolff, and Tainted the Investigation ........ 11
D. The Nature of the Case and Oversight by the Government ........ 14
E. The Government has not Disclosed Exculpatory Information From Witnesses ........ 15
   1. Paul Pearlson ........ 16
   2. Pellettieri and Pepe ........ 16
   3. Other Witnesses ........ 20

Argument ........ 21

I. The Government's Legal, Ethical, and Internal Obligations to Disclose Exculpatory Material ........ 21
II. The Court's Broad Discretion to Order the Government to Produce Exculpatory Evidence Beyond that Mandated by Brady and Rule 16 ........ 26

Categories of Requested Documents ........ 30

1. All cost-plus contracts awarded by USAID to LBG from 1990 through July 2009 (the period of the alleged conspiracy), including, without limitation, all such contracts allegedly "billed at knowingly inflated rates." *See*, the Indictment, Doc. 1, at 8. ........ 30
2. All audit reports and corresponding audit work papers, correspondence, and notes relating to all audits conducted by Government personnel (including those employed by the Defense Contract Audit Agency or "DCAA") of LBG dating back to at least the mid-1980s and relating to contracts between LBG and USAID. ........ 31
3. The following documents/information concerning *United States of America, Et Al. Ex Rel Salomon v. Berger Group Holdings, Inc. Et Al.*, C.A. No. RWT-06-1970 ("the Qui Tam matter") ........ 33
4. Documents, communications, and/or information arguably reflecting, indicating, or suggesting [exculpatory information] ........ 35

# TABLE OF AUTHORITIES

**Cases** **Page**

*United States v. Acosta*, 357 F. Supp. 2d 1228 (D. Nev. 2005) ............ 27, 29

*United States v. Agurs*, 427 U.S. 97 (1976) ............ 22, 25

*United States v. Armstrong*, 517 U.S. 456 (1996) ............ 23

*United States v. Bagley*, 473 U.S. 667 (1985) ............ 22, 23

*United States v. Barnes*, 1:06-CR-23-TS, 2006 WL 3093236 (N.D. Ind. Oct. 30, 2006) ............ 29

*United States v. Beckford*, 962 F. Supp. 748 (E.D. Va. 1997) ............ 27

*United States v. Bender*, 331 F. Supp. 1074 (C.D. Cal. 1971) ............ 27

*Berger v. United States*, 295 U.S. 78 (1935). ............ 25

*United States v. Boffa*, 513 F. Supp. 444 (D. Del. 1980) ............ 23

*Brady v. Maryland*, 373 U.S. 83 (1963) ............ *passim*

*United States v. Carter*, 313 F. Supp. 2d 921 (E.D. Wis. 2004) ............ 29

*Cone v. Bell*, 129 S. Ct. 1769 (2009) ............ 25

*United States v. Fletcher*, 74 F.3d 49 (4th Cir.1996) ............ 26

*United States v. Fregoso-Bonilla*, 05-CR-325, 2007 WL 2377306 (E.D. Wis. Aug. 16, 2007) ............ 29

*Giglio v. United States*, 405 U.S. 150 (1972) ............ 22

*United States v. King*, 1996 WL 254647 (D. Kan. Apr. 10, 1996) ............ 22

*United States v. Kloepper*, 725 F. Supp. 638 (D. Mass. 1989) ............ 27

*Kyles v. Whitley*, 514 U.S. 419 (1995) ............ 22, 25

*United States v. McVeigh*, 954 F. Supp. 1441 (D. Colo. 1997) ............ 22

*United States v. Naegele*, 468 F. Supp. 2d 150 (D.D.C. 2007) ............ 29

*Peek v. United States*, 321 F.2d 934 (9th Cir. 1963) ............ 27

*United States v. Peitz,* 01 CR 852, 2002 WL 226865 (N.D. Ill. Feb. 14, 2002)....29

*United States v. Price*, 566 F.3d 900 (9th Cir. 2009)....28

*Rinaldi v. Gillis*, 248 F. App'x 371 (3d Cir. 2007)....25

*United States v. Sudikoff*, 36 F. Supp. 2d 1196 (C.D. Cal. 1999)....29

*Strickler v. Greene*, 527 U.S. 263 (1999)....25

62 F.R.D. 271 (1974)....26

**<u>Statutes</u>**

31 U.S.C. § 3730....8, 9, 33

**<u>Rules</u>**

E.D.N.C., Rule 16.1....28

E.D. Wis., Crim. L. R. 16....28

Fed. R. Crim. P. 16.... *passim*

Fed. R. Crim. P. 57....26, 27

M.D. Ala., Standing Order on Criminal Discovery....28

M.D.N.C., L. Crim. R. 16.1....28

N.D. Cal., Crim. L. R. 16-1....28

N.D. Cal., Crim. L. R. 17.1-1....28

N.D. Fla., Rule 26.3....28

N.J. Rules of Prof'l Conduct R. 3.8(d) (2004)....24

S.D. Ala., L. R. 16.13....28

S.D. Ga., L. Crim. R. 16....28

S.D. W. Va., L. R. Crim. P. 16.1....28

W.D. Pa., L. Crim. R. 16....28

**Secondary Sources**

ABA Standards for Criminal Justice, Prosecution Function and Defense Function 3–3.11(a) (3d ed. 1993) ....................24

USAM § 9-5.001....................26

Wright, Federal Practice and Procedure § 253.2 (2001).................... 23-24

Wright, Federal Practice and Procedure § 256 (4th ed. 2011).................... 22-23

## PRELIMINARY STATEMENT

The Government claims it has no *Brady* material, but that claim is simply implausible.

On October 19, 2011, the federal government (the "Government") reached a major milestone in its nearly six-year crusade against Derish M. Wolff ("Mr. Wolff"), the former president and CEO of the Louis Berger Group ("LBG"), when it returned a six-count indictment accusing him of fraud and conspiracy to commit fraud. In January, 2006, the Government began working with former LBG employee Harold Salomon ("Salomon"), who in unusual fashion, seven months after cooperating with the government, was permitted by it to file a *qui tam* lawsuit against LBG on July 31, 2006. Although still under seal, this civil case almost certainly includes Mr. Wolff as a defendant. To this date, Mr. Wolff still has not been served. Even more unusual, the Government has kept the *qui tam* complaint under seal ever since – years after the Government intervened, years after the Government's criminal investigation became public, years after the *qui tam* complaint was amended, and even years after LBG settled the lawsuit. Inexplicably, nearly one year after the return of the Indictment against Mr. Wolff, the *qui tam* matter remains under seal. In keeping Salomon's information and other aspects of the *qui tam* matter secret, the Government has no doubt kept from Mr. Wolff information valuable to his defense. For example, it is obvious from

other materials that the Government ultimately repudiated aspects of the allegations brought by Salomon, whose allegations were the basis for the Government's search warrant. In the face of all this, incredibly, the Government has represented that it does not intend to call Salomon as a trial witness, and in that way, the Government will likely seek to justify keeping helpful information from Mr. Wolff. However, such materials are not merely impeachment materials (which the Government has also desperately avoided disclosing by seeking and obtaining a modification of this Court's original Discovery Order), they are *Brady* and Rule 16 materials, which the Government is obligated to disclose regardless of whether or not it calls Salomon as a witness.

During its six-year investigation, the Government has obtained millions of documents and interviewed scores of employees and other former employees of LBG. The Government's denial that it has any *Brady* material from any of these additional sources is belied by undisputed circumstances of the case.

The Indictment charges that Mr. Wolff directed and supervised a protracted scheme whereby LBG defrauded the United States Agency for International Development ("USAID") by inflating the overhead rates it charged USAID on cost plus contracts. It does so *notwithstanding* that: (1) the challenged overhead rates were expressly authorized by those contracts, were provisional only, were subject

to annual audits by the auditing agency for the federal government ("DCAA"), and were consistently accepted by USAID and DCAA over the relevant twenty-year period, and; (2) as the Government has acknowledged, LBG took action to reduce the challenged overhead rates *before* it knew of the Government's investigation. Nor does the Indictment accuse Mr. Wolff of direct involvement in the fraudulent conduct. Instead, it makes sweeping allegations, including, for example, that persons allegedly directly involved were "instructed" or "supervised" by Mr. Wolff, or were acting "as a matter of LBG *policy* that was knowingly advanced by" him. (Emphasis added). Notably, others who supervised these same subordinates and advanced the same alleged "policy," have not been charged. It is readily apparent that there are numerous Government interviews and notes that contain information inconsistent with the Government's theory of the case and should be turned over to the defense. And yet, the Government says that it has no *Brady*.

Further, while the Government has indicated that it likely will *not* call Salomon as a witness, its two principal and "cooperating" witnesses – Salvatore Pepe ("Pepe") and Precy Pellettieri ("Pellettieri") – previously professed not only their own innocence, but also Mr. Wolff's innocence.

In Pellettieri's case, despite several proffer sessions with the Government during which she consistently rejected Government implications that she and Mr. Wolff were involved together in a criminal conspiracy, the allocution questions the Government sent her counsel simply ignored her previous statements and yet again proposed that she state that she conspired with Mr. Wolff to bill USAID using falsely inflated overhead cost rates. Still, Pellettieri refused to falsely implicate Mr. Wolff. These exchanges between the Government and Pellettieri constitute *Brady* material, but the Government has represented that it has no *Brady* material.

Pepe, in turn, changed his position only after considerable Government pressure, which included the false representation that Pellettieri would implicate Mr. Wolff in the conspiracy. Again, this is not merely impeachment material, but *Brady* material, which the Government is obligated by law and court order to immediately disclose.

While arguably the Government has made *one Brady* disclosure, it did so only months after (1) obtaining the information and (2) previously representing that it had no *Brady* material. Further, although the information directly contradicts a central allegation of the Indictment, the Government represented that it was providing the information "in an abundance of caution and without conceding that the witness is, in fact, exculpatory."

The Government's current representation that it has no *Brady* material is patently false. While the Government pays lip service to its *Brady* obligations and assures us of its intent to comply with them, it has clearly failed to do so. *Brady* material must be identified in the context of the circumstances of the case, and the Government representations to date plainly reflect that it has deliberately assessed the case with self-imposed blinders in order to represent that it possesses no *Brady* material. Simply put, it is inconceivable that the Government has "no" materials favorable to the defense, particularly considering the nature and 20-year span of the charges, and witnesses' protestations of innocence (even if later changed) and rejection of Government efforts that they implicate Mr. Wolff in criminal acts of fraud or conspiracy. Accordingly, Mr. Wolff respectfully requests that, pursuant to Rule 16 and *Brady* and its progeny, the Court order the United States to conduct a careful and thorough review of its files and immediately produce all *Brady* material in the possession of the numerous agencies involved in the investigation,[1]

[1] Upon information and belief, these include the United States Attorneys for the District of New Jersey (the "USA-NJ"), for the District of Maryland (the "USA-MD"), the Civil Division, Fraud Unit, of the Department of Justice ("DOJ-Civil"), the United States Agency for International Development ("USAID"), the Federal Bureau of Investigation (the "FBI"), the Office of the Inspector General, Department of Defense ("DOD") and the Defense Criminal Investigative Service ("DCIS").

including, without limitation, all of the materials specifically identified in this motion. *See infra* at 30-37.

The Government has also failed to provide materials that are central to the allegations and, therefore, subject to Rule 16 disclosure. In essence, the Indictment accuses Mr. Wolff of orchestrating a scheme to cheat the federal government by submitting intentionally false invoices for hundreds of contracts with USAID over a twenty-year period. The Government has thus far failed, however, to provide all but two of these contracts, on the ground the hundreds of others directly implicated by the charges are too difficult or inconvenient for it to obtain from USAID offices abroad. The Government should be required to obtain and make all of these contracts available to the defense. *See infra* at 30-31.

## STATEMENT OF RELEVANT FACTS

### A. Background

Incorporated in 1953 by Dr. Louis Berger, LBG is largely an engineering, construction, and consulting company that manages various aspects of transportation, construction and environmental and socio-economic planning projects and assignments. It has employed nearly 3,000 people in more than 35 countries worldwide and generated hundreds of millions of dollars in annual revenue. LBG often partners and contracts with the United States Government and

has had a longstanding relationship for over 50 years with numerous federal agencies, including USAID. In 2002, LBG became a wholly owned subsidiary of Berger Group Holdings, Inc. ("BGHI" and collectively with LBG, "the Company"), which today also owns other construction, engineering, design, and socio-economic and environmental study concerns. Mr. Wolff began working at LBG in 1962, served as LBG's President and CEO from 1982-2002 and as non-executive Chairman of the Board of BGHI from 2002 to 2010. For several years leading into 2002, and certainly after 2002, Mr. Wolff focused on successfully expanding the Company through mergers and acquisitions and then worked to integrate the newly acquired affiliates. Nicholas Masucci, who has immunity, became LBG's president and CEO in 2002, and served in that capacity until he replaced Mr. Wolff as Chairman of the Board in 2010.

### B. Harold Salomon and the *Qui Tam Matter*

In January 2006, the Government began working with Salomon, a purported insider who worked in LBG's accounting department, to obtain information regarding LBG's alleged fraudulent billing practices. Doc. 38-4 at 12, ¶ 27. In July 2006, Salomon filed a sealed *qui tam* complaint ("the Complaint") against the Company in the United States District Court for the District of Maryland. *Id.* at 13, ¶ 29. Thus, Salomon began working with federal agents six months *prior* to filing the Complaint. This is contrary to standard procedure and indicates that the

Government orchestrated the filing and sealing of the Complaint, which allowed the Government to unilaterally cause charges against Mr. Wolff to remain on "lay-away" while Mr. Wolff remained defenseless and unaware.

As a *qui tam* relator, Salomon, who stood to gain a significant financial benefit if he convinced the Government to pursue his allegations,[2] knew that his accusations could be protected from disclosure – and they have been for six years. While the Government has caused the docket to remain under seal, it is now known that the Complaint, which was amended in July 2009, alleges, in sum, that the Company and its officers defrauded the Federal Government and several states in connection with contracts for construction, engineering and environmental projects.[3] To this day, more than six years after it was filed and at least two years

[2] As a *qui tam* relator, Mr. Salomon stands to make between 15% and 25% of any settlement amount obtained by the Government 31 U.S.C. § 3730(d). The settlement agreement with the Company provides for a civil payment of over fifty million dollars. On August 24, 2012, in response to Mr. Wolff's Motion to Suppress Evidence, the Government confirmed that "Salomon ultimately received a portion of the $50.6 million settlement as a reward," although it did not indicate the amount of such reward. Doc. 44 at 4, n.1.

[3] Aspects of the Complaint, as well as Salomon's identity as the relator, were made public in November, 2010, when LBG entered into a civil settlement. *See* Joe Ryan, *Morristown-Based Contracting Company To Pay U.S. Government $69M For Overbilling Scheme*, Star-Ledger, Nov. 6, 2010, *available at* http://www.nj.com/news/index.ssf/2010/11/us_government_settles_for_69m.html. Redacted versions of the Amended Complaint obtained by the Company reflect that LBG and Nicholas Masucci (Mr. Wolff's successor as President and CEO of
(footnote cont.)

after all aspects of the case became public, Mr. Wolff has not been served with the Complaint.[4]

Pursuant to 31 U.S.C. § 3730(a), the Government had a duty to "diligently" investigate Salomon's allegations and pursuant to subsection (b)(2) of that statute, Salomon had a duty to immediately serve the Government with a "written disclosure of substantially all material evidence and information" (the "Salomon materials").

The Government intervened and took over the *qui tam* action. After investigating for over a year, the Government relied primarily, if not exclusively, on the Salomon materials to support its application to search LBG's headquarters in East Orange, New Jersey. While the overbilling alleged in the supporting affidavit relates in large part to LBG's *domestic* billing of Government agencies,[5] the Government has since expressly acknowledged that there were *no* alleged

LBG) were named defendants, along with others whose names are redacted. Mr. Wolff is believed to be one of the others named.

[4] In continuing to keep the *qui tam* complaint under seal, the Government may well be acting in violation of a requirement that, absent good cause for an extension, a *qui tam* complaint can be kept under seal for only 60 days while the government determines if it will intervene. 31 U.S.C. § 3730(b)(2). It is inconceivable that the Government has had good cause to keep the Complaint under seal for over six years total, and five years *after* the criminal investigation became public in 2007.

[5] On July 13, 2012, Mr. Wolff filed a motion to suppress evidence seized pursuant to the August, 2007 warrant, in which the details of the search warrant affidavit are set forth. Mot. to Suppress (Doc. 38).

improprieties regarding the Company's domestic billings (*see* Deferred Prosecution Agreement, Doc. 38-3 at ¶ 2), and the Indictment charges none, *see* Indictment (Doc. 1). Inaccurate Information provided by the supposed insider, who caused the initiation of this investigation and received a substantial benefit, should be disclosed as *Brady* material.

At about the same time that the Complaint was amended, the Government identified as targets of the criminal investigation, Pepe and Pellettieri, but not Mr. Wolff. The apparent insufficiency of Salomon's information even to identify Mr. Wolff as a target effectively means that Salomon has provided information favorable to Mr. Wolff's defense. Apparently recognizing this, the Government has represented that it will not likely call Salomon as a witness at Mr. Wolff's trial. But Salomon's information is too central to the investigation to be simply passed off by the Government as irrelevant to the charges against Mr. Wolff: If it fails to inculpate Mr. Wolff then it should be disclosed as *Brady* material; alternatively, if it shows that the Government intentionally concealed Mr. Wolff's status as a target in order to also conceal Government actions taken against him behind the scenes, then that too is critical to Mr. Wolff's defense. (*See infra* at 11-13). The Government's decision to keep the *qui tam* matter sealed and Mr. Salomon under wraps does not relieve the Government of its *Brady* obligations.

### C. <u>Premature Conclusions or Misconceptions Led To Inappropriate Government Action Against Mr. Wolff, And Tainted The Investigation</u>

By keeping the *qui tam* action under seal for nearly six years while conducting its criminal investigation, the Government precluded the release of information in that civil matter that would have revealed the lack of reliable evidence of misconduct by Mr. Wolff. The Government thereby inappropriately prevented Mr. Wolff from developing defenses to pending allegations against him.

Up until 2011, only Pepe and Pellettieri were named by the Government as individual targets of the criminal investigation; indeed, Mr. Wolff's counsel were told in August 2010 in written papers submitted to the Court, that "no criminal or civil charges [had] yet been filed against LBG, [Mr. Wolff], or any other LBG employees or officers." *Derish M. Wolff v. United States*, Civil Action No. 10-4051 (SDW-MCA), (Doc. 3 at 5). This statement was clearly false.[6] Similarly, the Government emphatically misrepresented in argument before the Court on August 10, 2010 that Mr. Wolff was "not a target" of the investigation. Transcript of Proceeding at 18, *Derish M. Wolff v. United States*, Civil Action No. 10-4051

---

[6] As indicated above, the *qui tam* lawsuit was brought in 2006 against LBG and at least one of its officers, Nicholas Masucci. This much was made public in November 2010, when LBG settled the case against it and obtained a dismissal against Masucci. Although the matter remains under seal, we believe that Mr. Wolff and Pepe are also named as defendants. That the filed complaint was under seal does not permit the Government to make an affirmative statement that is patently inaccurate.

(SDW-MCA) (Aug. 10, 2010) (excerpt attached as Ex. 1). In truth, from mid-2009, the Government treated Mr. Wolff not just as a target, but as if he had already been criminally charged and convicted. Thus, even while keeping the *qui tam* allegations secret and shielded, and while representing that Mr. Wolff was *not* a target of its criminal investigation, the Government was in the process of orchestrating invasive and improper actions against Mr. Wolff.

As detailed in other submissions before this Court, in 2009, the Government severely and improperly restricted Mr. Wolff's business activities;[7] in 2010, the Government improperly encouraged the Company to terminate Mr. Wolff;[8] and once accomplishing that, even sought to illegally seize his property without due process.[9] While even the designation of "target" in and of itself would not have

[7] During a meeting in July 2009, USAID requested that Mr. Wolff exclude himself from LBG-Government contract work. Evidencing the Government's participation in, if not orchestration of, USAID's decision to so limit Mr. Wolff's pursuit of his livelihood, that meeting was attended by an Assistant United States Attorney who, at the time, was assigned to this criminal investigation. Reply to Government's Opposition to Motion for Bill of Particulars (Doc. 36 at 5-6).

[8] During the course of settlement discussions between the Government and LBG, when the company was most vulnerable to the demands of the Government, LBG terminated Mr. Wolff, to which the Government immediately responded that the termination was "acceptable" and that LBG "made good decisions". Id. (Doc. 36 at 6).

[9] By letter dated July 29, 2010, the Government "requested" and *de facto* instructed that Mr. Wolff's "buy-out" monies be placed indefinitely in escrow "*pending resolution* of all *Criminal* and Civil investigations into LBG *and/or Wolff*," even
(footnote cont.)

empowered the Government to so deprive Mr. Wolff of his employment or his property, to conceal its misconduct against Mr. Wolff, the Government misrepresented that he was not a target.

As also detailed in previous submissions before the Court, the Government (1) did not identify Mr. Wolff as a criminal target until months after its two cooperators pleaded guilty; (2) did not finally bring charges until a year after the pleas and only after Mr. Wolff refused to accept the Government's unprecedented offer to allow for the possibility of a conditional plea and a non-custodial sentence; (3) then (a) denied Mr. Wolff's request for voluntary surrender to the court assigned the matter and (b) even precluded the opportunity for him to make an application before the court once advised of such denial; and (4) chose instead to require Mr. Wolff – who the Government conceded posed no risk of flight – to surrender to the FBI, whereupon he was handcuffed and leg shackled for processing and later brought into court the same way. *See*, Reply to Government's Opposition to Bill of Particulars, Doc. 36 at 9-10. In fact, the only consideration shown to Mr. Wolff was the deferral of the presentation of the Indictment to the grand jury until after the Jewish High Holidays.

---

though *two weeks later* the Government would represent that Mr. Wolff was *not a target of its investigation*. Id. (Doc. 36 at 6-7).

**D. <u>The Nature of the Case and Oversight by the Government</u>**

The many difficulties faced by the Government in this investigation are not surprising. In essence, the Government has criminalized what, at most, should be a civil case, involving complex accounting procedures that were inherently subject to interpretation, disagreements, and mistakes. The Government itself concedes that overhead costs were expressly authorized by the contracts between LBG and USAID and that the overhead rates used in invoices to bill the overhead costs were "provisional," meaning that LBG and USAID agreed that government invoices for overhead costs were subject to change. LBG had an internal accounting staff dedicated to collecting costs and calculating overhead and indirect cost rates that were (1) governed by voluminous federal rules and regulations and (2) expected to be audited by DCAA. Thus, the parties contemplated that, each invoice LBG submitted would be audited by DCAA and, if such audit determined that the overhead rate used by LBG on that invoice was overstated, further negotiations between LBG, DCAA and USAID regarding payments due would follow. As part of this process, in 2007, months prior to any knowledge of the Government's investigation and in the absence of timely government audits, LBG conducted its own analysis, and concluded (correctly or not) that the overhead rate used to bill some government international contracts was lower than the 2002 provisional rate

it had been using,[10] submitted a revised proposed provisional rate and began issuing credits on Government invoices that added up to over $4.3 million.[11]

### E. The Government Has Not Disclosed Exculpatory Information From Witnesses

There is reason to believe that thirty or more present and former LBG employees interviewed by the Government were questioned about Mr. Wolff, and that the Government repeatedly expressed skepticism when witnesses were unable to implicate Mr. Wolff in criminal activity. High level executives, potentially including Masucci, Michel Jichlinski (the former COO), Paul Pearlson (the former controller), and others, may well have resisted any suggestion that they or Mr. Wolff were involved in a criminal conspiracy. None of them have been charged. As set forth below, it is obvious that even the Government cooperators, Pellettieri

[10] DCAA was behind in completing LBG audits and, in 2007, was still working to complete the audit of the 2002 provisional overhead rate, which LBG had been using in the interim.

[11] The Government itself acknowledged in 2010 that commencing in July / August 2007—at least a month prior to the search and any knowledge of the Government's investigation—LBG undertook "*extensive reforms and remedial actions* . . . [to include c]onducting a preliminary investigation into its cost accounting structure and refunding to the Government $4.33 million." Deferred Prosecution Agreement, (Doc. 38-3), at 3 (emphasis added). The contrary view that LBG "was *not* working . . . to resolve [these] matters" and "buried" the credits in invoices, as expressed in the Government's Opposition to Mr. Wolff's Motion to Suppress, (Doc. 44) at 12, is yet another example of a Government misrepresentation made in some misguided effort to unfairly advance its case against Mr. Wolff.

and Pepe, have made statements that are inconsistent with the Government's theory of the case and, therefore, material to preparing the defense.

**1. Paul Pearlson**

Paul Pearlson, the LBG executive long responsible for LBG's overhead rate and communications with USAID and DCAA, is believed to be the "P.P." alleged in the Indictment. While the Indictment alleges that "P.P.," along with Mr. Wolff, ordered LBG employees to "pad hours", Pearlson is believed to have denied this allegation.[12] Repudiations of Government accusations against Mr. Wolff must be disclosed as *Brady* and Rule 16 material. Moreover, the Government must make full disclosure of the information because Pearlson is not willing to speak with us.

**2. Pellettieri and Pepe**

It took the Government a substantial time to develop and evaluate the information provided by its two cooperators, Pellettieri and Pepe. Government

---

[12] Notably, the Government has failed to disclose this, notwithstanding its January 25, 2012 disclosure made "in an abundance of caution" and suggesting that counsel for Mr. Wolff "may wish to speak to Paul Pearlson" because many months before he had reportedly said that he was unaware that LBG had a target overhead rate. Government Letter, Jan. 25, 2012, Ex. 2. *Pearlson's statement directly contradicts a main theory of the Government's case*, *see* Indictment (Doc. 1) at 8-11, and *obviously* is *Brady* material and was so both on January 25, 2012, when the Government made the disclosure and on November 15, 2011 (Ex. 3 at 3), when it represented that it had no *Brady* material. Equally important, because the Government threatened Pearlson with charges (although none to date have been brought), Pearlson has refused to speak with counsel for Mr. Wolff.

prosecutors met with Pelletieri (and/or her attorney) on numerous occasions from late 2009 through her plea in November, 2010. Pepe is believed to have met with the Government, both directly and indirectly through counsel, on *numerous* occasions from about March, 2010 through his plea in November, 2010. The extended period over which these two eventual cooperators negotiated with the Government prior to their own pleas, as well as the additional year from the time of their pleas to the time of Mr. Wolff's indictment, is indicative of the Government's own uncertainty and foretells the existence of *Brady* material. Moreover, other unique circumstances establish that the Government possesses *Brady* material that it has not disclosed.

Pepe and Pellettieri both were questioned during their plea allocution about the involvement of "Executive A," clearly a reference to Mr. Wolff.[13] A comparison of questions propounded to each of them clearly reflects that Pellettieri rejected Government efforts that she implicate Mr. Wolff in criminal activity.

[13] No other LBG executive, besides Pellettieri, Pepe, and Wolff, has been charged. Moreover, the similarities between the allegations of the indictment and the allocution questions indicate that "Executive A" was intended to refer to Mr. Wolff. We rely upon the Government to inform the Court if this conclusion has been reached in error.

The Government allocution questions posed to Pepe during his plea proceeding included very few facts implicating Mr. Wolff. However, the Government posed and obtained an affirmative response to the following question:

> Q: From approximately September 2001 through August of 2007, did you agree *with Executive A, Pellettieri and others*, to bill USAID and other federal agencies for LBG's indirect costs at falsely inflated GG rates[14]?

Excerpt of Pepe Plea Allocution, Ex. 4, at 25 (emphasis added). Pellettieri was asked the following question, which is nearly identical, but conspicuously omits any reference to "Executive A," *i.e.*, Mr. Wolff:

> Q: From about September 2001 through August 2007, did you agree *with Pepe, and others* to bill USAID and other federal agencies for LBG's indirect costs at falsely inflated GG rates?

Excerpt of Pellettieri Plea Allocution, Ex. 5, at 28 (emphasis added). Significantly, while other allocution questions posed to Pellettieri reference "Executive A", none directly implicates him in a conspiracy to commit fraud.

The genesis of Pellettieri's plea allocution has fortuitously become known to us despite the Government's failure to disclose it. In January, 2010, despite several proffer sessions with the Government during which she consistently

[14] "GG" was the designation used to refer to indirect (or overhead) costs that were believed to be attributable to government contracts. Thus, the "GG rate" was the overhead rate attributable to the government.

rejected the Government's assertions and refused to implicate Mr. Wolff in a criminal conspiracy, the allocution questions the Government sent her counsel simply ignored those consistent refusals, and yet again proposed that she state that she conspired with Mr. Wolff to bill USAID using falsely inflated overhead cost rates. But Pellettieri still refused to falsely implicate Mr. Wolff. These exchanges between the Government and Pellettieri are critical to the defense and constitute *Brady* material, which the Government has concealed by representing that it is "unaware of any *Brady* material regarding [Mr. Wolff]." Government Letter, Nov. 15, 2011, Ex. 3, at 3.

Although Pepe implicated Mr. Wolff during his plea allocution, even if only in veiled and general terms, the details regarding how and why Pepe crossed the Rubicon are critical to Mr. Wolff's defense. Those details are not known to Mr. Wolff, however, we do know that Pepe and his counsel attempted to show the Government that his own behavior was not criminal and, critically, repeatedly denied that Mr. Wolff directed or pressured him to commit any fraudulent acts. The Government threatened that Pepe would serve 6½ to 7 years in jail before promising to stipulate to a U.S. Sentencing Guidelines range of 30 to 36 months to persuade him to plead guilty and implicate Mr. Wolff. Most egregiously, however, the Government falsely represented that Pellettieri would respond affirmatively to

the allocution questions implicating Mr. Wolff when, in fact, she had specifically rejected the Government's accusations. The full details and notes of Pepe's assertions that Mr. Wolff had done nothing wrong, and the exchanges between the Government and him that caused him to alter his account should be disclosed as *Brady* and Rule 16 material.

**3. Other Witnesses**

Other witnesses, likely to include other officers of the Company and members of Pellettieri's and Pepe's staff, have also provided accounts that are inconsistent with the Government's theory of the case or are otherwise favorable to Mr. Wolff. The Government claims that the fraud scheme was pursuant to a company-wide "policy" to commit fraud advanced within the Company over a twenty-year time-period. First, a "policy" of fraud lasting twenty-years, by definition, would have infected much of the Company - certainly persons within the accounting department – and guided actions. Therefore, statements and information provided by employees who claimed not to know about the fraud, particularly those within the accounting department, is *Brady* material and should be disclosed.

Moreover, numerous persons besides Mr. Wolff served as senior managers during the period of the alleged conspiracy, including Nicholas Masucci, who took

over Mr. Wolff's position as president and CEO of LBG mid-way through the period, Michael Jichlinski, who served as the chief operations officer of LBG during critical years, and others allegedly directly involved in the fraud (e.g., "P.P.", and the LBG assistant controller(s) referenced in the Indictment, *see* (Doc. 1 at 2, 10-11)). Those persons, and others similarly situated, have not been charged. Considering the wide breadth of these allegations, which purportedly involved a twenty-year company-wide "policy" to commit fraud around the world, any denials regarding knowledge of or involvement in the scheme, and/or Mr. Wolff's participation in the scheme, are inconsistent with the Government's theory of the case and should be disclosed.

Such statements should not be limited to those between the Government and witness. Government efforts through an intermediary to cajole witnesses to implicate Mr. Wolff, and witness responses received through counsel, should also be disclosed.

## ARGUMENT

### I. The Government's Legal, Ethical, and Internal Obligations to Disclose Exculpatory Material

***Brady*.** It is well settled that the Due Process Clause of the Fifth Amendment requires the Government to disclose evidence favorable to the defendant that is material to either guilt or punishment. *See, e.g., Brady v.*

*Maryland*, 373 U.S. 83, 87-88 (1963); *United States v. Agurs*, 427 U.S. 97, 110-11 (1976); *United States v. Bagley*, 473 U.S. 667, 676 (1985); *Kyles v. Whitley*, 514 U.S. 419, 437-38 (1995). It is equally well settled that the favorable evidence the Government must disclose under *Brady* includes, among other things, evidence that tends to exculpate the accused. *E.g.*, *Giglio v. United States*, 405 U.S. 150, 154 (1972); *Bagley*, 473 U.S. at 676-77. The breadth of the *Brady* doctrine was aptly put in *United States v. McVeigh*, 954 F. Supp. 1441 (D. Colo. 1997) (Matsch, C.J.):

> What [the government] may not do is suppress or secrete information known to them which does not fit into the [prosecution's] narrative, or which contradicts the evidence used to support that narrative, or which may diminish the credibility of the evidence relied on to tell the story. Stated simply, the prosecutors must not present proof of an historical narrative that they know not to be true. They must disclose to the defense the information known to or available to them which may develop doubt about the truth of the government's narrative.

*Id*. at 1449.

Further, the defendant in a criminal case is entitled to discovery of internal government documents containing *Brady* material even where work product protection would otherwise apply. *E.g.*, *United States v. King*, 1996 WL 254647, at *5 n.1 (D. Kan. Apr. 10, 1996) (citations omitted); 2 C. Wright, Federal Practice and Procedure § 256 (4th ed. 2011) ("Because *Brady* is based on the Constitution, it overrides court-made rules of procedure. Thus, Rule 16(a)(2) prohibits

discovery of work product but it does not alter the prosecutor's duty to disclose material that comes within *Brady*."); *United States v. Armstrong*, 517 U.S. 456, 475 (1996) (Breyer, J., concurring) (same).

In the context of appellate review, *Brady* and its progeny treat a prosecutor's failure to disclose exculpatory evidence as a due process violation, warranting a new trial if the suppressed evidence was "material." In this context, evidence is considered "material" if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682.

***Fed. R. Crim. P. 16(a)(1)(E)(i)*.** Rule 16(a)(1)(E) (formerly 16(a)(1)(C)) states in pertinent part:

> Upon a defendant's request, the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, . . . or copies or portions of any of these items, if the item is within the government's possession, custody, or control and:
> (i) the item is material to preparing the defense….

The "materiality" requirement for production of documents under Rule 16(a)(1)(E) is essentially the same as the "materiality" requirement under *Brady*. *See United States v. Boffa*, 513 F. Supp. 444, 449–50 (D. Del. 1980) (stating that materiality standard under Rule 16 is the same as under *Brady*). *See generally* Charles A. Wright & Arthur R. Miller, 2 Fed. Prac. & Proc. Crim. § 253.2 (2000)

(stating "if evidence is 'material either to guilt or punishment' and 'favorable to an accused,' within the *Brady* formulations, it seems that a fortiori it must be 'material to the preparation of his defense within ... Rule 16(a)(1)'"). *But see* Fed. R. Crim. P. 16 advisory committee's notes to the 1974 amendment (declining to explicitly codify the *Brady* Rule in Rule 16 but suggesting that although *Brady* may require "materiality," Rule 16 is not so limited).

***Prosecutors' Ethical Obligations to Produce Exculpatory Evidence to the Defense*.** N.J. Rules of Prof'l Conduct R. 3.8(d) (2004), which is binding on the Government prosecutors in this case, provides in pertinent part that "[t]he prosecutor in a criminal case shall . . . make timely disclosure to the defense of all evidence known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense . . . except when the prosecutor is relieved of this responsibility by a protective order of the tribunal." *See also,* ABA Standards for Criminal Justice, Prosecution Function and Defense Function 3–3.11(a) (3d ed. 1993) ("A prosecutor should not intentionally fail to make timely disclosure to the defense, at the earliest feasible opportunity, of the existence of all evidence or information which tends to negate the guilt of the accused or mitigate the offense charged or which would tend to reduce the punishment of the accused").

As the Supreme Court recently reiterated in *Cone v. Bell*, 129 S. Ct. 1769, 1783 n.15 (2009), these ethical obligations of a prosecutor to disclose evidence favorable to the defense go beyond the prosecutor's duty under *Brady*:

> Although the Due Process Clause of the Fourteenth Amendment, as interpreted by *Brady,* only mandates the disclosure of material evidence, the obligation to disclose evidence favorable to the defense may arise more broadly under a prosecutor's ethical or statutory obligations. (citing, *Kyles,* 514 U.S., at 437, 115 S.Ct. 1555 (quote omitted)). See also ABA Model Rule of Professional Conduct 3.8(d) (2008)…. As we have often observed, the prudent prosecutor will err on the side of transparency, resolving doubtful questions in favor of disclosure. (citations omitted).

Further, in noting prosecutors' "broad obligation to disclose exculpatory evidence" beyond that mandated under *Brady*, the Supreme Court and the Third Circuit have often cited and quoted the Supreme Court's observation in *Berger v. United States*, 295 U.S. 78, 88 (1935) that a prosecutor is "the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Id*., quoted in, *e.g., Kyles v. Whitley*, 514 U.S. 419, 439 (1995), *Strickler v. Greene*, 527 U.S. 263, 281 (1999); *Agurs*, 427 U.S. at 110-111; *Rinaldi v. Gillis*, 248 F. App'x 371, 381-82 (3d Cir. 2007).

***United States Attorneys' Manual*.** While the United States Attorneys' Manual ("USAM") interprets *Brady* to reach only "[e]xculpatory and impeachment evidence…material to a finding of guilt," and interprets the "materiality" standard as requiring disclosure only "when there is a reasonable probability that effective use of the evidence will result in an acquittal" (USAM § 9-5.001(B)(1)), it also states that it is Department of Justice policy to provide "[d]isclosure of exculpatory and impeachment information beyond that which is constitutionally and legally required" (USAM § 9-5.001(C)).

## II. The Court's Broad Discretion to Order the Government to Produce Exculpatory Evidence Beyond that Mandated by *Brady* and Rule 16

The Advisory Committee Notes to Fed. R. Crim. P. 16 specifically explain: "The rule is intended to prescribe the *minimum* amount of discovery to which the parties are entitled. *It is not intended to limit the judge's discretion to order broader discovery in appropriate cases*." Advisory Committee Note to Rule 16, reprinted in 62 F.R.D. 271, 308 (1974) (emphasis added).

Indeed, the inherent power of federal courts to order criminal discovery beyond that explicitly authorized by rule or statute is not only well established in the case law,[15] it is explicitly recognized in Fed. R. Civ. P. 57(b), which provides

[15] *See, e.g. United States v. Fletcher,* 74 F.3d 49, 54 (4th Cir.1996) (district court had inherent authority to require defendant to produce witness list prior to trial); (footnote cont.)

that, where no law or rule is directly applicable, "[a] judge may regulate practice in any manner consistent with federal law, these rules, and local rules of the district." Fed.R.Crim.P. 57(b). *See, e.g., United States v. Acosta*, 357 F. Supp. 2d 1228, 1233-34 (D. Nev. 2005) ("Federal Rule of Criminal Procedure ("Rule") 57(a) provides clear authority for district courts to make rules governing pretrial criminal procedure so long as the Local Rules do not conflict with federal law", and citing Ninth Circuit case that recognized the wide latitude of the district court to carry out its mandate to effectuate, as far as possible, the speedy and orderly administration of justice.); *accord United States v. Beckford,* 962 F. Supp. at 756-57; *Kloepper*, 725 F.Supp. at 640.

Significantly, consistent with their broad discretion, numerous federal courts throughout the country have ordered the Government to disclose all pre-trial

---

*Peek v. United States*, 321 F.2d 934, 942 (9th Cir. 1963) ("[Q]uite apart from [Fed. R. Crim. P.] Rules 16 and 17(c) the court possesses inherent authority to grant requests for production of material."); *United States v. Bender*, 331 F. Supp. 1074, 1075-76 (C.D. Cal. 1971) ("to the extent Rule 16 of the Federal Criminal Rules does not express a policy prohibiting any discovery not explicitly authorized by the Rules, the Court is free either by local rule or by its own adjudication to permit discovery on the basis of its inherent power."); *United States v. Kloepper*, 725 F. Supp. 638, 640, 641 (D. Mass. 1989) (relying upon the court's inherent power to permit discovery not described in Fed.R.Crim.P. 16); *United States v. Beckford*, 962 F. Supp. 748, 756-57 (E.D. Va. 1997) (collecting cases) ("numerous courts… have recognized that the discovery provisions in Rules 12.2 and 16(b) are not exclusive and do not supplant a district court's inherent authority to order discovery outside the rules").

evidence that might reasonably be considered "exculpatory" or "favorable" to the defense, regardless of whether that evidence is "material," as that term is defined in *Brady* and its progeny, and to resolve any doubts in favor of full disclosure. Some of these Courts have done so through their adoption of local rules and standing orders.[16] Others have done so through decisions in individual cases.[17]

---

[16] *See, e.g.,* M.D. Ala., Standing Order on Criminal Discovery ("All information and material known to the government which may be favorable to the defendant on the issues of guilt or punishment, without regard to materiality" is to be produced at arraignment); S.D. Ala., L. R. 16.13 (same); N.D. Cal., Crim. L. R. 16-1 and 17.1-1 (statement addressing the disclosure of exculpatory or other evidence favorable to the defendant is due four days prior to pretrial conference); N.D. Fla., Rule 26.3. (information and material which may be favorable to the defendant, without regard to materiality, is due within five days of arraignment); S.D. Ga., L. Crim. R. 16 ("any evidence favorable to the defendant" is subject to inspection by defendant's attorney); E.D.N.C., Rule 16.1 ("any exculpatory evidence" subject to inspection by defendant's attorney); M.D.N.C., L. Crim. R. 16.1 ("government's case file" must be "fully reviewed" by counsel prior to filing discovery motions); W.D. Pa., L. Crim. R. 16 ("exculpatory evidence" subject to inspection and copying); S.D. W. Va., L. R. Crim. P. 16.1 and Arraignment Order and Standard Discovery Requests ("all evidence favorable to defendant, including impeachment evidence," is subject to disclosure); E.D. Wis., Crim. L. R. 16 (if the government is following the "open file policy" it must disclose... "all exculpatory material.").

[17] *See, e.g., United States v. Price*, 566 F.3d 900, 913 (9th Cir. 2009) ("For the benefit of trial prosecutors who must regularly decide what material to turn over, we note favorably the thoughtful analysis set forth by two district courts in this circuit: [T]he 'materiality' standard usually associated with Brady ... should not be applied to pretrial discovery of exculpatory materials.... [J]ust because a prosecutor's failure to disclose evidence does not violate a defendant's due process rights does not mean that the failure to disclose is proper.... [T]he absence of prejudice to the defendant does not condone the prosecutor's suppression of exculpatory evidence [ex ante].... [Rather,] the proper test for pretrial disclosure of
(footnote cont.)

exculpatory evidence should be an evaluation of whether the evidence is favorable to the defense, i.e., whether it is evidence that helps bolster the defense case or impeach the prosecutor's witnesses.... [I]f doubt exists, it should be resolved in favor of the defendant and full disclosure made (citations omitted); *United States v. Naegele*, 468 F. Supp. 2d 150, 152-55 (D.D.C. 2007) ("under Brady and its progeny '[t]he government is obligated to disclose all evidence relating to guilt or punishment which might be reasonably considered favorable to the defendant's case, that is, all favorable evidence that is itself admissible or that is likely to lead to favorable evidence that would be admissible, or that could be used to impeach a prosecution witness…. [and] the duty to disclose evidence 'favorable to the accused' pretrial (and during trial) applies 'without regard to whether the failure to disclose it likely would affect the outcome of the upcoming trial.'") (citations omitted); *United States v. Fregoso-Bonilla*, 05-CR-325, 2007 WL 2377306 at *1 (E.D. Wis. Aug. 16, 2007) ("[T]he materiality standard assumes that the trial has already occurred, thus permitting the court to evaluate whether the withheld evidence might have changed the result. In deciding whether evidence should be disclosed prior to trial the standard is simply whether the evidence is favorable to the accused, with any doubts resolved in favor of disclosure."); *United States v. Barnes*, 1:06-CR-23-TS, 2006 WL 3093236 at *3 (N.D. Ind. Oct. 30, 2006) (evidence that "relates to guilt or punishment and . . . tends to bolster the defendants' case or impeach a prosecution witness under the particular circumstances of this case" should be disclosed, and questions as to the usefulness of the evidence should be resolved in favor of full disclosure.); *United States v. Acosta*, 357 F. Supp. 2d 1228, 1232-34 (D. Nev. 2005) (court disagreed with government's contention that Brady's materiality standard is the limit of the duty to disclose); *United States v. Carter*, 313 F. Supp. 2d 921, 925 (E.D. Wis. 2004) ("[I]n the pre-trial context, the court should require disclosure of favorable evidence under Brady and Giglio without attempting to analyze its 'materiality' at trial because the judge "cannot know what possible effect certain evidence will have on a trial not yet held."); *United States v. Peitz*, 01 CR 852, 2002 WL 226865 at *3 (N.D. Ill. Feb. 14, 2002) ("In the pretrial context, 'the government is obligated to disclose all evidence relating to guilt or punishment which might reasonably be considered favorable to the defendant's case, with doubt as to usefulness resolved in favor of disclosure.") (citation omitted); *United States v. Sudikoff*, 36 F. Supp. 2d 1196, 1198-1200 (C.D. Cal. 1999) ("Whether disclosure [under *Brady*] would have influenced the outcome of a trial can only be determined after the trial is completed and the total effect of all the inculpatory evidence can

(footnote cont.)

## CATEGORIES OF REQUESTED DOCUMENTS

Each of the specific categories of documents/information included in the Requested Materials are in the Government's possession, custody and control, and, in addition, are "material to preparing the defense" within the meaning of Rule 16(a)(1)(E)(i), arguably favorable to the defense, or both. Accordingly, for the reasons detailed in Points I and II of the Argument, *supra*, and as further detailed category by category below, the Court should exercise its broad discretion to order immediate disclosure of each such category of documents/information for the further reasons provided as follows:

**1. All cost-plus contracts awarded by USAID to LBG from 1990 through July 2009 (the period of the alleged conspiracy), including, without limitation, all such contracts allegedly "billed at knowingly inflated rates."** ***See*****, the Indictment, Doc. 1, at 8.**

The Government should be ordered to produce all of the referenced contracts because (1) they are the very *corpus delicti* of the alleged fraud – neither Mr. Wolff, nor, for that matter, the Court nor the jury can meaningfully assess the Government's charges against Mr. Wolff without considering the very contracts to which those charges pertain; (2) Mr. Wolff does not currently have these contracts;

---

be weighed against the presumed effect of the undisclosed Brady material…. [I]n the pretrial context [therefore,] it would be inappropriate to suppress evidence because it seems insufficient to alter a jury's verdict…. Thus, the government is obligated to disclose all evidence relating to guilt or punishment which might reasonably be considered favorable to the defendant's case.") (citations omitted).

and (3) if it chooses to, the defense should at trial be able to demonstrate as to each such contract the falsity of the allegation that it was implicated in the alleged wrongdoing. These contracts are obviously "material to preparing the defense." The Government has recently indicated that it instructed USAID to begin locating certain of the U.S.-based contracts, however, there are many more non-U.S.-based cost-plus contracts between USAID and LBG, and the Government has also represented that it is not inclined to gather these contracts without first having an opportunity to explain its position to the Court. The Government should be ordered to produce all such contracts forthwith.

**2. All audit reports and corresponding audit work papers, correspondence, and notes relating to all audits conducted by Government personnel (including those employed by the Defense Contract Audit Agency or "DCAA") of LBG dating back to at least the mid-1980s and relating to contracts between LBG and USAID.**

As previously indicated, Government and outside auditors, as well as Government contract officers, poured over LBG's accounting and billing processes on a regular basis. DCAA auditors took up residence at LBG's offices for extended periods of time. The audit process involved extensive review and exchanges with Company personnel regarding errors, which were a part of the process. While the Government alleges that certain of these errors were intentional and pursuant to a scheme to defraud—preparation of the defense is critically dependent upon the observations made and conclusions reached by Government

auditors conducting reviews during the time period of the alleged fraud. Having a complete set of audit reports and supporting auditor notes and work papers is essential to preparing the defense.

Mr. Wolff has copies of DCAA audit reports, but none of the requested audit work papers, correspondence, or notes. Significantly, none of the audit reports Mr. Wolff has seen identify any actual or potential fraudulent conduct with respect to LBG's overhead rates.[18] Accordingly, if there are any additional audit reports that the Government has not previously provided, such reports should be disclosed as they are plainly "material to preparing the defense" within the meaning of Fed. R. Civ. P. 16(a)(1)(E)(i).

The audit reports, however, do not provide all of the requisite information regarding the work performed and the conclusions reached by the DCAA auditors and other auditors retained by USAID. Therefore, preparation of the defense is even more critically dependent upon the supporting audit work papers, correspondence, and notes. Certainly, with respect to the audit reports Mr. Wolff already has—which reflect no fraudulent conduct of the sort alleged in the indictment—the audit work papers, correspondence, and notes supporting those

[18] It is noteworthy that of the audit reports possessed by the defense, none were provided by the Government as *Brady* material, even though certain conclusions and/or observations contained in the audit reports are favorable to the defense.

reports are at least "arguably favorable" to the defense, and should also be ordered and produced.

3. **The following documents/information concerning *United States of America, Et Al. Ex Rel Salomon v. Berger Group Holdings, Inc. Et Al.*, C.A. No. RWT-06-1970 ("the *Qui Tam* matter"):**

   a. **Complete (and unredacted) copies of the complaint and amended complaint filed under seal in 2006 and 2009, respectively.**

   b. **Documents and/or communications[19] provided to Government prosecutors, civil attorneys, law enforcement agents, or other Government employees (hereinafter, "the Government") pursuant to the *Qui Tam* matter by the Relator, Harold Salomon, including those submitted prior to the filing of the Qui Tam Complaint, those pursuant to 31 U.S.C. § 3730(b)(2), and any such documents and/or communications provided or made through counsel.**

   c. **All submissions made by the Government in support of, and orders granting, the continued sealing of the *Qui Tam* matter.**

   d. **Documents and/or communications between Government attorneys or agents working on the criminal investigation and Government attorneys or agents working on the *Qui Tam* matter, including communications relating to the sealing of the *Qui Tam* matter.**

As detailed above, while the Government relied primarily, if not exclusively, upon Salomon's *qui tam* allegations and information to obtain the warrant to search LBG's headquarters in East Orange, New Jersey, the Government subsequently rejected and excluded from the Indictment a substantial portion of

[19] As used in this motion, "documents and/or communications" are intended to include, without limitation, emails, correspondence, statements, reports, interview memoranda, grand jury or other testimony, and other in person or telephonic verbal communications or notes thereof.

Salomon's *qui tam* allegations, *i.e.*, those charging LBG and Wolff with overbilling the Government in connection with domestic costs. Mr. Wolff has moved to suppress evidence seized pursuant to that search warrant, and in that motion has requested a pretrial suppression hearing. As much of Salomon's allegations and information on which the search warrant was based and granted has since proven unreliable, the requested materials are plainly "material to preparing the defense" within the meaning of Rule 16(a)(1)(E)(i), especially as regards Mr. Wolff's pending motion and requested suppression hearing.

It is also curious that Salomon began working with federal agents six months *prior* to Salomon filing the Complaint. This is contrary to standard procedure and indicates that the Government orchestrated the filing and sealing of the Complaint. Under these circumstances, the exchange of information between Salomon and the Government is critical to Mr. Wolff's defense.

Furthermore, four years after Salomon filed his *qui tam* allegations, whereupon he was required to provide the Government with full information, the Government represented that Mr. Wolff was not a target of its investigation. If Salomon's information was truly insufficient to permit the Government to identify Mr. Wolff as a target of its criminal investigation then such information must include *Brady* material. If, on the other hand, Salomon's information shows that

the Government intentionally misrepresented its position regarding Mr. Wolff in order to conceal actions it took against him behind the scenes then that too is critical to Mr. Wolff's defense.

4. **Documents, communications, and/or information arguably reflecting, indicating, or suggesting, one or more of the following:**

   a. **that Mr. Wolff was not a source of the "targeted" overhead rates alleged in the Indictment, including, without limitation, that (i) contrary to Count One ¶12(d) of the Indictment, Mr. Wolff did *not* order Salvatore Pepe "to target a GG rate in the 140s"; (ii) contrary to Count One ¶¶ 6, 12(f), 12(g), 12(h), and/or 12(i) of the Indictment, Mr. Wolff did *not* "knowingly advance" the alleged LBG policy of targeting GG rates "of at least 140%" or "in the 140s";**

   b. **that LBG's alleged targeted government overhead rates were based on reasons (i) other than an intention to fraudulently overstate those rates or (ii) different from or inconsistent with (A) those reasons charged in the Indictment or (B) the alleged scheme to defraud the government;**

   c. **that Mr. Wolff did *not* instruct others to pad hours as alleged in Count One ¶¶ 7, 12(a) and 12(b) of the Indictment;**

   d. **that Mr. Wolff did *not* direct Pellettieri, Pepe, or others to improperly classify non-government overhead costs as Government overhead costs, as alleged in ¶¶ 8 and 9 of the Indictment.**

   e. **that Mr. Wolff neither "knowingly advanced" a policy of charging the Government for LBG Washington D.C. office overhead costs unrelated to USAID or other Government contracts (as alleged in ¶ 10 of the Indictment), nor instructed LBG's Assistant Controller to charge the Government for such costs (as alleged in ¶ 12(c) of the Indictment).**

   f. **that Mr. Wolff directed, instructed, or requested others to identify and/or correct potential errors or misstatements in, or to assure the accuracy of, LBG's calculations of the Government overhead rate;**

   g. **that Mr. Wolff directed, instructed and ordered others to perform their jobs properly rather than in violation of the law or pursuant to a scheme to defraud the Government as alleged in the Indictment;**

**h. that employees of LBG made unintentional mistakes in calculating the Government overhead rate;**

**i. that employees of LBG made mistakes in calculating the Government overhead rate that favored the Government, or incorrectly understated the Government overhead rate;**

**j. that the nineteen-year conspiracy to defraud the United States, or any portion or aspect thereof, as alleged in Count One of the Indictment, (a) did not occur or exist or (b) that Mr. Wolff was not a member, participant, or co-conspirator in that alleged conspiracy, or any portion or aspect thereof, including, without limitation, statements or communications by Pepe, Pellettieri, Masucci, or Jichlinski to that effect;**

**k. that Mr. Wolff did not knowingly and intentionally aid, abet, counsel, command, induce, and/or procure the commission of Making and Presenting of False, Fictitious, and Fraudulent Claims, as alleged in Counts Two through Six of the Indictment; and**

**l. that the facts as alleged in the Indictment are otherwise untrue or inaccurate.**

These requests seek materials that contradict or are inconsistent with key allegations of the Indictment. As such materials are obviously both "favorable to" and "material to preparing" the defense, the Government should be required to produce them forthwith. We specifically request that the Government be ordered to identify and produce the foregoing documents and information as may be embodied or found in sources including, without limitation, (1) documents seized from LBG; (2) documents produced pursuant to grand jury or administrative subpoenas; (3) documents voluntarily produced by any witness or other person or entity, including any communications with and reports of statements by such

witnesses and/or their counsel on their behalf, and any notes thereof (*see* fn 19, *supra*); (4) prosecutive or similar government internal memoranda, whether from the United States Attorney's offices for Districts of New Jersey or Maryland, the Civil Fraud Section of the United States Department of Justice, any government investigative agency, or otherwise and; (5) records of the United States Department of Probation.

Respectfully submitted,

Dated: September 14, 2012
Florham Park, New Jersey

STERN & KILCULLEN, LLC
*Attorneys for Defendant Derish Wolff*

By: s/ Mark Rufolo
Herbert J. Stern, Esq.
Mark Rufolo, Esq.
Jeffrey Speiser, Esq.
Joel M. Silverstein, Esq.
325 Columbia Turnpike
Florham Park, New Jersey 07932
Telephone: 973.535.1900
Facsimile: 973.535.9664